UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REENA REYNOLDS and SHALINI SHARMA<br><br>Plaintiff,<br><br>v.<br><br>SKYLINE REAL ESTATE LIMITED, SKYLINE TREASURY DESIGNATED ACTIVITY COMPANY, UNICORN REAL ESTATE LIMITED, UNICORN REAL ESTATE ONE LIMITED, UNICORN REAL ESTATE TWO LIMITED, FRANCES ABETON, and EDWARD DECLAN BYRNE<br><br>Defendants. | Civil Action No. 1:22-cv-01241 |

## FIRST AMENDED COMPLAINT

Plaintiffs Reena Reynolds and Shalini Sharma bring this First Amended Complaint to recover funds that were fraudulently obtained and illegally misappropriated through the various Defendant companies controlled by Frances Abeton and Edward Declan Byrne.

## PRELIMINARY STATEMENT

Between June 2017 until the present, Defendants have made numerous misrepresentations and omissions to Plaintiffs and other investors to induce them to invest in the Skyline and Unicorn Entities (as defined below). Plaintiffs and the other investors have sustained economic and reputational harm as a result of Defendants' actions.

## PARTIES

1. Reena Reynolds is a United States citizen located in Chicago, Illinois. Based on the

representations of Defendants to Plaintiffs, Ms. Reynolds appears to be shareholder and noteholder in Skyline DAC, Skyline and Unicorn (all are defined below).

2. Shalini Sharma is a United States citizen located in Chicago, Illinois and currently residing in Florida. Based on the representations of Defendants to Plaintiffs, Ms. Reynolds appears to be shareholder and noteholder in Skyline DAC, Skyline and Unicorn (all are defined below).

3. Skyline Treasury Designated Activity Company ("Skyline DAC") was set up by Defendants in Ireland on December 12, 2017. Skyline DAC was represented by Defendants to Plaintiffs as being registered as an Alternative Investment Fund ("AIF"). Defendants represented to Plaintiffs that Skyline was the depository for the funds invested by Plaintiffs and that those funds went from Skyline DAC to the various Skyline and Unicorn ventures. At all times relevant, Frances and her husband, Paul Abeton were Directors of Skyline DAC.

4. Skyline Real Estate Limited ("Skyline Limited") was set up by Defendants on January 2, 2018. It was represented by Defendants to Plaintiffs as being the issuer of certain "interest free loan notes" and equity shares that were held by Skyline's United States investors, including but not limited to, Plaintiffs. At all time relevant, Declan Byrne, and Frances and Paul Abeton were Directors of Skyline Limited.

5. Skyline Limited and Skyline DAC are collectively called the "Skyline Entities" herein.

6. Unicorn Real Estate Limited ("Unicorn") was set up on April 5, 2017. It was represented by the Defendants as being the issuer of certain "interest bearing loan notes" issued to Skyline, and Defendants have represented to Plaintiffs that they are investors in Unicorn. At all times relevant, Frances Abeton was a Director of Unicorn.

7. Unicorn Real Estate One Limited ("Unicorn One") was set up on September 28,

2018. Although set up by Defendants and, on information and belief, holding Plaintiffs' assets, its existence was never disclosed to Plaintiffs. At various times, Declan Byrne and Paul Abeton were Directors of Unicorn One.

8. Unicorn Real Estate Two Limited ("Unicorn Two") was set up on September 28, 2018. Although set up by Defendants and, on information and belief, holding Plaintiffs' assets, its existence was never disclosed to Plaintiffs. At various times, Declan Byrne and Paul Abeton were Directors of Unicorn Two.

9. Unicorn, Unicorn One and Unicorn Two are collectively called the "Unicorn Entities" herein.

10. Frances Abeton is citizen of the Republic of Ireland and resides in Dublin, Ireland.

11. Edward Declan Byrne is a citizen of the Republic of Ireland and resides in Wicklow County, Ireland. He is the brother of Frances Abeton.

## **JURISDICTION & VENUE**

12. This is a civil action arising under Section 10(b) of the Exchange Act (15 U.S.C. 78j(b)) and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R §240.10b-5).

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this district under Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the fraud or the effects of the fraud occurred in this district.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**FORMATION OF THE SCHEME**

16. In June 2017, Ms. Reynolds, Ms. Abeton and Mr. Byrne began setting up a real estate venture in Ireland which would be funded by investments from contacts of Ms. Reynolds in the United States which consisted of her friends and family (Herein referred to as the "U.S. Investors").

17. Ms. Reynolds was responsible for identifying and introducing Ms. Abeton and Mr. Byrne (the "Individual Defendants") to other potential investors in the U.S. Post-funding, Ms. Reynolds would liaison with those investors on Defendants' behalf.

18. Paul Abeton served as a Director to various entities.

19. Frances Abeton was responsible for providing the information about the investment opportunity to Plaintiffs and the other U.S. investors, and for managing the commercial activity and commitment of the investment funds in Ireland on a day-to-day basis.

20. Declan Byrne was responsible for overseeing the construction and on-site project management of the various investment real estate projects.

21. The investment strategy proposed by the Individual Defendants was as follows: Cash would be committed by the U.S. Investors, including Plaintiffs, and those cash investments would then be leveraged to obtain debt financing in Ireland.

22. These investor funds, along with the debt funds, would then be used to purchase real estate in Ireland. Mr. Byrne and the Abeton's would then oversee the development and sale of those properties. These projects were residential in nature. Basically, the Skyline and Unicorn entities would buy land, build houses and sell them for a profit.

4

23. A key element of this investment scheme was the successful acquisition of the debt financing from private financial institutions located in Ireland.

24. As explained to Plaintiffs by the Individual Defendants, to acquire debt financing, Defendants needed to show that they had a certain amount of assets under their custody and control before a bank would loan them money. Defendants lacked the capital needed on their own. It was therefore critical to the venture that they raise sufficient funds from the U.S. Investors (including Plaintiffs) to satisfy the banks in Ireland that they were contributing sufficient capital of their own to the real estate venture. Accordingly, the funds that Defendants sought to raise from Plaintiffs and the other U.S. Investors were critical to the success of Defendants' overall investment schemes.

## DEFENDANTS' REAL ESTATE PROJECTS

25. Plaintiffs are aware of at least three real estate projects undertaken by Defendants in Ireland between 2018 and the present: "Bollarney Woods" ("Project One"); "Wicklow Arms" ("Project Two") and "Gorey, Wexford" ("Project Three").

**Project One, Bollarney Woods**

26. Project One was a social housing project located on the outskirts of Wicklow Town, Ireland. It consisted of 33 homes.

27. Ms. Abeton raised money for this project by soliciting Ms. Reynolds and other U.S. Investors for a series of equity and loan note investments. She was aided in this endeavor by her husband, Paul Abeton.

28. Ms. Reynolds' investment in Project One consisted of (a) a cash investment of $100,000 and (b) her efforts on behalf of the venture in return for a stock award of shares in the Skyline and Unicorn Entities that would be worth approximately $528,000.

29. In soliciting Ms. Reynolds' investment and participation in the venture, Ms. Abeton and Mr. Byrne represented to Ms. Reynolds the following:

    a. Ms. Reynolds, Mr. Byrne and Ms. Abeton would have equal control and authority over Skyline Limited, which would then in turn control the other various investment entities;

    b. Skyline DAC would be registered as an Alternative Investment Fund in Ireland;

    c. The investments made by and through the Skyline and Unicorn Entities would yield a guaranteed return of principal plus an annual dividend plus no less than a 25% profit at the close of the project;

    d. Neither the Abeton's or Declan Byrne or Ms. Reynolds would receive any salaries, compensation or benefits during the course of the project beyond their investment holdings; and

    e. Ms. Reynolds, Ms. Abeton and Mr. Byrne would have 33% split of profits that resulted from the venture, payable through Skyline Limited.

30. The Individual Defendants made these representations with the intent of inducing Ms. Reynolds to invest her efforts and money into the venture at a time they knew that such representations were false and misleading.

31. Ms. Reynolds relied on the representation that her ownership interest and control of the operations of Skyline Limited (including her access to relevant corporate documents and financial information) would be the same as Ms. Abeton's and Mr. Byrne's control and access. At the time Ms. Abeton and Mr. Byrne made those promises, they knew that was not the case, and their representations in that regard to Ms. Reynolds were false when made.

32. In making her investment and agreeing to support Defendants' pursuit of investments from Ms. Reynolds' personal friends and colleagues, Ms. Reynolds relied on the individual Defendants' misrepresentations that she would have equal control and full access to the Skyline Entities' and the Unicorn Entities' financial records and corporate records.

33. The Individual Defendants knew that these assurances of control and oversight were untrue statements when they were made, as they had no intention of providing such information and access to Ms. Reynolds, and in fact, never did provide such information and access to Ms. Reynolds.

34. Believing that Ms. Abeton and Mr. Byrne had granted her equal control and access with them in the venture, and that she would be provided with full access to Defendants financial data, Ms. Reynolds proceeded to identify and introduce Ms. Abeton to her friends and colleagues in the Chicago, Illinois area beginning in 2017.

35. Specifically, in 2017, Ms. Abeton began travelling to Chicago, Illinois to meet and solicit investments from a number of Ms. Reynolds' friends and professional acquaintances (hereafter, the "Chicago Meetings").

36. During 2017 and 2018, Ms. Abeton made a number of material misrepresentations to potential investors to induce them to invest in the Skyline and Unicorn Entities.

37. For example, Ms. Abeton solicited investors by misrepresenting to them that Ms. Reynolds was a controlling member in Skyline Limited with her and Mr. Byrne—with commensurate control and insight into its day-to-day operations in support of the venture.

38. This was a material misrepresentation because the Individual Defendants knew that it was not true—but also knew that it was critical to the prospective U.S. Investors that Ms. Reynolds be an equal partner in this regard with Ms. Abeton and Mr. Byrne in the venture.

39. The Individual Defendants misrepresented to Ms. Reynolds and the other U.S. Investors that Ms. Reynolds would have access to all pertinent financial data regarding the Skyline and Unicorn Entities, so that she could oversee the day-to-day activities and performance of the U.S. investors' investments in Project One. Plaintiffs and the other U.S. Investors relied on this misstatement of Ms. Abeton's when they invested.

40. Individual Defendants knew this was untrue statement when it was made, as they had no intention and never did give Ms. Reynolds access to any of the business or financial information about Project One.

41. This criterion was critical in the U.S. Investors' decision to invest as Ms. Abeton was not personally known to any of the investors, but Ms. Reynolds was known and trusted by them.

42. During this time, Ms. Abeton also represented to the potential investors that Skyline DAC was registered as an AIF under Irish law.

43. An AIF is a type of investment vehicle that is a collective of investor funds that may be organized as trust, or another type of corporate entity. Such an entity must be authorized (or "registered") with the Central Bank of Ireland. As such it is regulated by the Central Bank of Ireland, among other governmental agencies.

44. Skyline DAC was never registered as an AIF. The Individual Defendants misrepresented this fact to the investors and potential investors in Project One, including Ms. Reynolds.

45. Ms. Reynolds and other investors relied upon this misrepresentation when investing in the Skyline and Unicorn entities.

46. The Individual Defendants also promised a 25% minimum return on any investments made in Project One.

47. Ms. Reynolds and other investors relied upon these representations when investing in the Skyline and Unicorn entities.

48. These representations were false as it omitted to include or disclose any of the risks that are inherent in real estate development, or investment of the same.

49. The Individual Defendants knew that they could not make such an assurance and therefore knew that it was a false statement when made.

50. The Individual Defendants also represented that Project One would be completed in one year when they knew that this could not be true.

51. In fact, Project One was not completed for a number of years.

52. The Individual Defendants also failed to disclose to investors that they intended to have the Project One construction company be an entity owned or controlled by the Individual Defendants.

53. Specifically, the construction contractor on the project, ASB Construction Limited ("ASB"), is an entity owned or controlled by the Abetons and Declan Byrne. ASB was set up on July 13, 2018—shortly before the groundbreaking of Project One. Upon information and belief, it is owned or controlled by the Individual Defendants.

54. ASB was paid hundreds of thousands of dollars (in Euros) that ultimately went to substantially enrich Ms. Abeton, Mr. Abeton and Mr. Byrne.

55. This material fact regarding the ownership of ASB was omitted by all of the Defendants, rendering their other statements about the nature and financing concerning Project One misleading.

56. In addition to this misleading omission, Ms. Abeton and Mr. Byrne affirmatively misrepresented to Plaintiffs and the other U.S. Investors that the only compensation they were receiving from these ventures was from the expected profits of the ventures. This was demonstrably false.

57. As a result of the Chicago Meetings, and in reliance on the misstatements of Defendants as outlined above, over $700,000 was raised by Defendants from investors in the Chicago, Illinois area for investment in Project One. This does not include the $100,000 in cash and the promised ownership interest that was committed by Plaintiff Reynolds.

58. Further, at some point in 2017 or 2018, Defendants used those investor funds to obtain a bank loan from Castlehaven Finance ("Castlehaven"). Castlehaven is an alternative lender located in Ireland that provides property development and bridge financing to businesses.

59. Upon information and belief, Castlehaven lent Defendants funds based on the funds raised from Plaintiff Reynolds and the other U.S. Investors. To date, Defendants refuse to provide Plaintiffs or the other U.S. investors with any information regarding the Castlehaven loans.

60. Although the majority of money for Project One was raised in late 2017 and paid in January 2018, the actual groundbreaking for Project One did not take place until about August 2018.

61. After groundbreaking on Project One, Defendants built and sold the various homes of Project One.

62. Defendants never informed Plaintiff Reynolds or the other U.S. Investors that the homes of Project One were sold.

63. To the contrary, Defendants misrepresented to Plaintiffs and the other U.S. Investors that the homes had not in fact been fully sold.

64. It was not until May 2020, that Plaintiffs learned that the County Council of Wicklow purportedly purchased all of the houses developed as part of Project One.

65. After being confronted with this fact, Defendants claimed that the sales of the Project One homes was not fully complete. This was a false statement.

66. According to publicly available documents, the County Council purchased the homes for approximately €11.7 million.

67. Defendants never informed Plaintiffs or the other U.S. Investors of the timing of the transfers or amounts involved when the house closings were complete even though they were inquiring as to the status of the project weekly.

68. Once confronted with this fact, Defendants purported to pay some of the U.S. Investors their principle and purported profits. Upon information and belief, the amount repaid by Defendants was fraudulent, as they retained a portion of funds that should have gone to the U.S. Investors' profits and used them to pay ASB inflated amounts, as well as to provide additional financing to both Project Two and Project Three.

69. Further, Ms. Reynolds has never been paid her principle and profits for Project One despite repeated requests for repayment or an accounting of profits and losses.

**Project Two, Wicklow Arms**

70. For Project Two, the parcel of land to be developed was in Delgany, Ireland at the site of the historic Wicklow Arms Pub.

71. The development site was approximately 2 acres consisting of the main building, other buildings and a parking lot.

72. Plaintiff Shalini Sharma is an investor in Project Two. In reliance on the below misrepresentations, Ms. Shalini invested over $140,000 in Project Two.

73. In addition to being an investor in Project Two, Ms. Sharma was told by Defendants that she was to hold a 20% ownership in various Skyline and Unicorn entities.

74. Ms. Sharma agreed to partner and invest in the Skyline and Unicorn Entities based on the misrepresentations made about Ms. Reynolds' co-equal holdings in Skyline Limited and her status as an investor in Skyline DAC and the Unicorn Entities.

75. Ms. Abeton and her husband Paul Abeton travelled to Chicago, Illinois to raise funds from Plaintiffs' personal and professional acquaintances for investment in Project Two.

76. While there, Mr. Abeton met prospective investors, including Plaintiffs. In speaking to Plaintiffs, Mr. Abeton confirmed that the statements being made by Ms. Abeton were indeed accurate. On information and belief, Mr. Abeton knew or should have known that those statements made by Ms. Abeton were false.

77. Documents given to Plaintiffs list Paul Abeton as a Director of Skyline DAC and Skyline Limited, among other entities related to Defendants fraudulent scheme.

78. During this trip, Defendants misrepresented to Plaintiffs and the other U.S. Investors that:

    a. Skyline DAC was a registered in Ireland as an AIF.

    b. Project Two had a minimum return of 100% return of principle and an assurance of a profit between 25% and 30%.

    c. There was an omission of a material fact in that the company hired to do the construction, ABS , is owned by the non-entity Defendants.

    d. The affirmative misstatement that the only compensation the Individual Defendants would receive was from the profits of the enterprise.

    e. Funds from Project One were misappropriated from Plaintiff Reynolds to

assist in funding Project Two and Project Three.

      f.      Plaintiff Sharma was a 20% "partner" in Project Two.

      g.      Plaintiff Reynolds was a 26.6% "partner" in Project Two.

      h.      The U.S. Investors in Project Two would directly own 10% of the Project Two investment entities.

      i.      In addition to the cash raised from the Plaintiffs and other U.S. Investors, the Abeton's and Mr. Byrne were committing their personal capital and using their personal assets as collateral to help finance the transaction; in conjunction with a second loan from Castlehaven Finance.

      j.      Defendants would share all financial and business data with Plaintiffs on an ongoing basis; so that Plaintiffs could monitor and assess the financial performance of their investments and the investments of the other U.S. investors.

79.      In Summer 2018, Ms. Abeton met with Ms. Sharma in Chicago, Illinois and told Ms. Sharma that she was going to amend the Skyline Limited corporate documents to reflect Ms. Sharma's 20% percent ownership, and that she would have an agreement setting out the terms of this new "partnership" between her, Ms. Reynolds, Ms. Shalini and Mr. Byrne drafted immediately.

80.      This was a misrepresentation by Ms. Abeton—as she has never intended to have such documentation drafted—even though Ms. Abeton and Mr. Lynch hold certain power of attorneys that give them authority to perform certain functions relating to Skyline limited on behalf of Ms. Reynolds and Ms. Sharma. Despite this, at no time has Ms. Reynolds nor Ms. Sharma ever received any information or notifications from Ms. Abeton regarding Skyline Limited or its financial or business activities. Ms. Sharma and Ms. Reynolds requested this paperwork numerous

times, but was never provided with the requested information.

81. It was initially agreed that there would be a target of €1.5m. raised from U.S. investors. Ms. Abeton subsequently insisted on raising that target to €1.8m without providing financial data as to why this was required.

82. As a result of Ms. Abeton and Mr. Abeton's solicitations to the U.S. Investors, including Plaintiffs, a total of €1.63m was invested by U.S. investors.

83. Thereafter, in Fall 2018, Ms. Abeton claimed that, because of the shortfall of €170,000, Castlehaven would not provide enough funding to finance the entire Project Two. Therefore, the Skyline and Unicorn Entities had to sell a majority portion of the land and the pub to other developers. Upon information and belief, this claim was a misrepresentation by Defendants—and the cause was not the shortfall in the targeted investment from U.S. Investors but the fact that Project Two was never "approved" by local authorities for more than 12 houses and 10 apartment units attached to the Wicklow Arms Pub.

84. In addition, Ms. Abeton claimed that with the "reduced" scope of Project Two, the Defendants now could only build 12 instead of 35 houses on the Delgany land and that the project scope and profit would therefore significantly be reduced.

85. Despite this limited scope, Defendants did not return any of the U.S. Investors' funds, including those of Plaintiffs.

86. Notwithstanding numerous requests by Ms. Reynolds and Ms. Sharma, Defendants have refused to provide any information or documents supporting these claims regarding the reduced scope of Project Two.

87. Defendants continue to refuse to share details of any Castlehaven loan amounts; any of the terms of the claimed loans from Castlehaven or any financial information concerning

Defendants' claims that they had to sell the Wicklow Arms Pub and half of the lands available for development.

88. Defendants' claims about the Wicklow Arms project were false when made.

89. Contrary to Defendants' claims, there was never any governmental permission to build 35 housing units as represented by Defendants. At most, 22 units were approved for construction—12 housing units and 10 apartment units connected to the Wicklow Arms Pub itself.

90. To date, the Project Two investors have not been paid and there has been no indication as to when payment will occur.

91. Upon information and belief, the 12 housing units compromising Project Two have all been pre-sold, four of those sales have not closed.

92. Upon visual inspection of the Project Two property, it appears that construction of the four remaining houses in Project Two has never been completed. Upon information and belief, all progress on developing and completing Project Two ceased as of October 2021.

93. Defendants have repeatedly refused to provide specific numbers and information on where the sales proceeds from those first eight homes has gone, and Defendants refuse to answer any questions or pay the investors any proceeds, including Plaintiffs.

**Project Three, Gorey Wexford**

94. It is Ms. Reynolds' understanding that Ms. Abeton and Mr. Byrne took out a third loan from Castlehaven in October of 2020 for the development of 31 homes in Gorey, Wexford.

95. Upon information and belief, Defendants have misused proceeds from Project One and Project Two to fund Project Three. This includes funds invested by Plaintiffs, as well as by the other U.S. Investors.

15

## CLAIMS

### COUNT ONE
### Violation of Exchange Act Section 10(b) and Rule 10b-5
### (All Defendants)

96. Plaintiffs repeat and reallege the preceding paragraphs as if fully incorporated herein.

97. Defendants made materially false and misleading statements and omissions to Plaintiffs in connection with the purchase or sale of securities.

98. Defendants knew that these statements were false and misleading at the time of making them. These misstatements were made with scienter.

99. Plaintiffs relied on these statements in making their decision to invest in the Skyline Entities and the Unicorn Entities.

100. Defendants' false and misleading statements have caused Plaintiffs substantial economic loss.

101. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102. As a direct and proximate result of Defendants wrongful conduct, Plaintiffs have suffered damages.

### COUNT TWO
### FRAUD IN THE INDUCEMENT
### (All Defendants)

103. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

104. Defendants made materially false and misleading statements and omissions to Plaintiffs.

16

105. Defendants knew that these statements were false and misleading at the time of making them.

106. Plaintiffs relied on these statements in making their decision to invest in Skyline.

107. Defendants' false and misleading statements have caused Plaintiffs substantial economic loss.

108. As a result of the actions taken in reliance on Defendants' false statements and other actions in furtherance of his fraudulent scheme, Plaintiffs invested substantial amounts in the Skyline Entities and the Unicorn Entities.

109. But for the misrepresentations of Defendants, Plaintiffs would not have invested in Defendants' fraudulent real estate investment schemes.

## COUNT THREE
## INTENTIONAL MISREPRESENTATION
### (All Defendants)

110. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

111. Defendants made materially false and misleading statements and omissions to Plaintiffs.

112. Defendants knew that these statements were false and misleading at the time of making them.

113. Plaintiffs relied on these statements in making their decision to invest in the Skyline Entities and the Unicorn Entities.

114. Defendants' false and misleading statements have caused Plaintiffs substantial economic loss.

115. As a result of the actions taken in reliance on Defendants' false statements and other

actions in furtherance of their fraudulent scheme, Plaintiffs invested in Defendants' fraudulent real estate investment schemes.

116. But for the misrepresentations of Defendants, Plaintiffs would not have invested in Defendants' fraudulent real estate investment schemes.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION
## (All Defendants)

117. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

118. Defendants made materially false and misleading statements and omissions to Plaintiffs.

119. Defendants knew that these statements were false and misleading at the time of making them.

120. Plaintiffs relied on these statements in making their decision to invest in Skyline.

121. Defendants' false and misleading statements have caused Plaintiffs substantial economic loss.

122. As a result of the actions taken in reliance on Defendants' false statements and other actions in furtherance of their fraudulent schemes, Plaintiffs invested in Defendants' fraudulent real estate investment schemes.

123. But for the misrepresentations of Defendants, Plaintiffs would not have invested in Defendants' fraudulent real estate investment schemes.

## COUNT FIVE
## CONVERSION
## (All Defendants)

124. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs

as if fully set forth herein.

125. Defendants made materially false and misleading statements and omissions to Plaintiffs.

126. Defendants knew that these statements were false and misleading at the time of making them.

127. Plaintiffs relied on these statements in making their decision to invest in the Skyline Entities and the Unicorn Entities.

128. Defendants' false and misleading statements have caused Plaintiffs substantial economic loss.

129. As a result of the actions taken in reliance on Defendants' false statements and other actions in furtherance of their fraudulent real estate schemes, Defendants wrongly converted €3,873,189 of Plaintiffs' funds for their own use.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that this Court:

A. Award compensatory damages in favor of Plaintiffs, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

B. Award punitive and exemplary damages in favor of Plaintiffs in an amount to be determined at trial or by this Court.

C. Award Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

  D.  Award any other equitable, injunctive, or other further relief that the Court may deem just and proper.

DATED: December 23, 2022

                ARMSTRONG TEASDALE LLP

                By: */s/ Brittney J. Herron*
                   Brittney J. Herron #6325665
                   7700 Forsyth Blvd., Suite 1800
                   St. Louis, Missouri 63105-1847
                   (314) 621-5070
                   (314) 621-5065 (facsimile)
                   bherron@atllp.com

                   And

                   John A. Sten, BBO #629577
                   Allison R. McFarland, BBO #703697
                   Armstrong Teasdale LLP
                   800 Boylston Street, 30th Floor
                   Boston, Massachusetts 02199
                   jsten@atllp.com
                   amcfarland@atllp.com

                ATTORNEY FOR PLAINTIFFS